**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN DUBISKY, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | Civil Action No. |
| v. | § § | CLASS ACTION COMPLAINT FOR |
| | § | VIOLATION OF THE FEDERAL |
| STONEGATE MORTGAGE CORPORATION, | § | SECURITIES LAWS |
| RICHARD A. KRAEMER, KEVIN BHATT, | § | |
| JAMES G. BROWN, SAM LEVINSON, | § | |
| RICHARD A. MIRRO, and SCOTT | § | |
| MUMPHREY, HOME POINT FINANCIAL | § | |
| CORPORATION, and LONGHORN MERGER | § | |
| SUB, INC. | § | |
| Defendants. | | |

Plaintiff John Dubisky ("Plaintiff"), on behalf of himself and all others similarly situated, shareholders of Stonegate Mortgage Corporation ("Stonegate" or the "Company"), by and through the undersigned counsel, alleges the following upon information and belief, including the investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged on knowledge:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this shareholder class action on behalf of the public shareholders of Stonegate against Stonegate's Board of Directors (the "Board" or the "Individual Defendants") for its violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, arising out of its attempt to sell the Company to Home Point Financial Corporation ("Home Point"), through its wholly owned subsidiary, Longhorn Merger Sub, Inc. ("Merger Sub" and together with Home Point, referred to collectively as "Home Point"), by means

1

of an unfair process and for an unfair price. This action does not challenge the specific price of the Proposed Transaction.

2.      Headquartered in Indianapolis, Indiana, Stonegate is a leading, non-bank mortgage company focused on originating, financing, and servicing U.S. residential mortgage loans that operates as an intermediary between residential mortgage borrowers and the ultimate investors of these mortgages.

3.      On January 27, 2017, the Company announced that it had entered into a Definitive Merger Agreement, dated January 26, 2017 (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into the Company with the Company surviving as a wholly owned subsidiary of Home Point (the "Proposed Transaction").

4.      Pursuant to the Merger Agreement, Home Point will acquire all of the outstanding shares of Stonegate for $8.00 in cash in exchange for each share of Stonegate common stock owned at closing (the "Merger Consideration"). At the time of the announcement, the consideration to be received by Stonegate stockholders was valued at just $8.00 per share – a *30% premium* to the Company's 52-week high trading price of $6.15 per share.  However, as recently as September 17, 2015, Stonegate was trading at $8.26, which is above the Merger Consideration of $8.00. Given the overall strength of the Company and its poise for future growth, the Merger Consideration *significantly* undervalues Stonegate.

5.      Given the strength of the Company and its poise for future success, Home Point will acquire Stonegate at a price that does not accurately reflect the inherent, standalone value of Stonegate. The Company continues to position itself for significant growth and increased profitability. Indeed, the Company recently realized one of its most profitable quarters, and was poised for ongoing standalone success that would have generated a higher value than the Merger Consideration.  Moreover, in a Press Release on November 3, 2016, the Company disclosed its most recent third quarter 2016 financial

results.  In the Press Release, Jim Smith ("Smith"), Chief Executive Officer ("CEO") of the Company, discussed the Company's increasing growth, stating:

> Our business platform was well prepared to benefit from increased production levels during the quarter and, as a result, we achieved GAAP earnings of $15.6 million and adjusted net income of $11.0 million. We continue to be highly focused on maintaining prudent liquidity and MSR debt levels, as well as fully leveraging our cost structure. Thanks to the dedication and commitment of our associates and the support of our many customers, Stonegate continues to deliver value to our shareholders.

6.     Under the terms of the Merger Agreement, the Defendants (defined below) have further tilted the playing field in favor of Home Point with a slate of deal protection provisions that unreasonably deter third party bidders from launching topping bids, including:  (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose confidential information about competing bids to Home Point promptly, or within forty-eight hours; (iii) a "matching rights" provision that provides range with three (3) business days to match any competing proposal that might arise, as well as an additional three (3) business days following a material amendment to the terms and conditions of a competing proposal; (iv) a "change of recommendation" provision that requires the Board of Director to refrain from changing its recommendation in a manner adverse to Parent unless there is a "material development"; (v) a prohibitively large termination fee of $7,250,000 to be paid by Stonegate in the event it chooses to pursue an alternative, superior offer; and (vi) a "no-waiver" provision that requires the Board to enforce any existing confidentiality or standstill agreements. In addition, the Company has entered into a Tax Asset Protection Plan, which functions to dilute the ownership stake of a potential acquirer, making it more expensive to buy the company and dissuading potential third party purchasers in the process.  The Company has further locked up the deal

by entering into voting agreements pledging to vote approximately 35.9% of Stonegate's outstanding shares in favor of the Proposed Transaction.

7.     These deal protection provisions, particularly when considered collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Stonegate.

8.     In pursuing the plan to facilitate the acquisition of Stonegate by Home Point for grossly inadequate consideration, and through a flawed process, the Defendants have violated Sections 14(a) and 20(a) of the Exchange Act by causing a materially incomplete and misleading Form 14a Proxy Statement ("Proxy") to be filed with the U.S. Securities and Exchange Commission ("SEC") on February 28, 2017. The Proxy recommends that Stonegate stockholders vote in favor of the Proposed Transaction based on misleading information and without disclosing all material information, which renders the Proxy misleading.

9.     Most critically, the management projections underlying the fairness opinion of Barclays Capital ("Barclays"), Stonegate's financial advisor in the Proposed Transaction, are missing vital information, without which stockholders are unable to accurately judge whether the Proposed Transaction is in their best interests. In addition, the Proxy also contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the financial analyses conducted by Barclays.

10.     In short, for these reasons and as set forth in detail herein, the Proposed Transaction is designed to unlawfully divest Stonegate's public stockholders of the Company's valuable assets following a flawed, tilted sales process, in exchange for consideration that does not reflect the Company's standalone, inherent value, and without fully disclosing all material information concerning the transaction to the Company's stockholders.  To remedy Defendants' Exchange Act violations,

Plaintiff seeks injunctive relief preventing consummation of the Proposed Transaction unless and until the material information discussed below is disclosed to Stonegate stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## THE PARTIES

11.    Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Stonegate.

12.    Defendant Stonegate is a corporation organized and existing under the laws of the State of Ohio.  The Company maintains its principal executive offices at 9190 Priority Way, Suite 300, Indianapolis, Indiana 46240.  Stonegate common stock trades on the NYSE under the ticker symbol "SGM." According to its public filings, Stonegate is a leading, non-bank mortgage company focused on originating, financing, and servicing U.S. residential mortgage loans that operates as an intermediary between residential mortgage borrowers and the ultimate investors of these mortgages. The Company operates in three segments: Originations, Servicing and Financing.

13.    Defendant Richard A. Kraemer ("Kraemer") is Chairman of the Board of Stonegate and has been a member of the board of directors of the Company since May 2013.

14.    Defendant Kevin Bhatt ("Bhatt") has been a director of the Company since February 2012.

15.    Defendant James Brown ("Brown") has been a director of the Company since February 2012, and is a member of the Risk Management Committee.

16.    Defendant Sam Levinson ("Levinson") has been a director of the Company since May 2013, and is Chair of the Compensation Committee, and is a member of the Audit Committee, and the Nominating and Governance Committee.

17. Defendant Richard A. Mirro ("Mirro") has been a director of the Company since February 2012, is Chair of the Audit Committee, and is a member of the Compensation Committee, and Nominating and Governance Committee.

18. Defendant Scott Mumphrey ("Mumphrey") has been a director of the Company since February 2010, is Chair of the Nominating and Governance Committee, and is a member of the Audit Committee, and Compensation Committee.

19. Defendants Kraemer, Bhatt, Brown, Levinson, Mirro, and Mumphrey are collectively referred to herein as the "Board" or the "Individual Defendants."

20. Defendant Home Point is a New Jersey corporation with its headquarters located at 1194 Oak Valley Drive, Suite 80, Ann Arbor MI 48108, that, is a national multi-channel mortgage originator and servicer.

21. Defendant Merger Sub is an Ohio corporation wholly owned by Home Point that was created for the purposes of effectuating the Proposed Transaction.

## JURISDICTION AND VENUE

22. Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. 17C.F.R. § 240. l4a-9.

23. The Court has jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Stonegate is incorporated under the laws of the State of Ohio, and therefore is a citizen of Ohio.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) the conduct at

issue took place, at least in part, and had an effect in this district; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein through the vehicle of an Ohio Corporation occurred in this District; and (iii) defendants are engaging in numerous activities that had an effect in this District, including the incorporation of Stonegate.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on behalf of himself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all owners of Stonegate common stock, and their successors in interest, who are being and will be harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

26.   This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of January 27, 2017, Stonegate had approximately 25,854,022 shares issued and outstanding.

(b)     There are questions of law and fact which are common to the Class, including, *inter alia*, the following:

(i)     whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives, including offers from interested parties for the Company or its assets;

(ii)     whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiffs and the other members of the Class;

(iii)    whether the Individual Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(iv)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(v)     whether Plaintiff and the other members of the Class would be irreparably harmed were the Proposed Transaction complained of herein consummated; and

(vi)    whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct;

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of those of the other members of the Class;

(e)     Plaintiff has no interests that are adverse to the Class;

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

8

(g)     Conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation, and thus a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

(i)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE COMPANY

27.     Stonegate Mortgage Corporation, an Ohio corporation, is a publicly traded non-bank mortgage company focused on originating, financing and servicing agency and non-agency U.S. residential mortgage loans. The Company operates as an intermediary between residential mortgage borrowers and the ultimate investors of mortgages through originating, financing, and servicing U.S. residential mortgages. Stonegate common stock trades on the NYSE under the ticker symbol "SGM."

28.     On March 03, 2016, the Company announced its financial results for the fourth quarter of 2015. The Company reported net income of $1.1 million, or $0.04 per diluted share, compared to a net loss of $19.7 million, or $0.76 per diluted share, for the fourth quarter 2014.

29.     In the press release announcing the financial results, Defendant Kraemer, the Company's Chairman of the Board and interim CEO, commented on Stonegate's bright outlook, stating,

> "We have completed the implementation of certain operating efficiencies and restructuring changes, which have allowed us to make good progress on the expense base reductions while maintaining our most productive business operations and locations, as we discussed last quarter. These efforts reduced our annualized fixed expenses by more than $35 million, and as a result we are now well-positioned for 2016 with a lower fixed expense base and leaner operations."

30.     On May 10, 2016, Stonegate announced its financial results for the first quarter of 2016. The Company reported net loss of $37.5 million, or $1.45 per diluted share, compared to a net loss of $9.6 million, or $0.37 per diluted share, for the first quarter 2015.  Jim Smith, Chief Executive Officer of Stonegate commented in the press release announcing the results, stating:

> Our first quarter results were significantly impacted by a $35.7 million decline in the fair market value of our MSR asset and a 15% decrease from the prior quarter in mortgage originations from continuing operations that, while disappointing, was consistent with the overall decline in the industry as a whole during the first quarter, based on preliminary data from the Mortgage Bankers Association. Even in these difficult conditions, we made additional progress in optimizing the expense structure of our business…. As we move forward, these cost structure improvements will enhance our competitive position and drive improved operating performance. We remain highly focused on increasing overall shareholder value, improving execution and maintaining a strong balance sheet.

31.     The Company has continued to optimize its expense structure for the past few consecutive quarters.  In the second quarter of 2016, for example, Stonegate sustained a net loss of $17.2 million, or $0.66 per diluted share, compared to a reported net income of $11.1 million or $0.43 per diluted share from the second quarter of 2015.    In the August 04, 2016 Press Release, the Company disclosed its second quarter 2016 financial results and CEO Jim Smith expressed his hopeful outlook for the Company's future, stating:

> The success of our restructuring efforts and execution of our cost management strategies have positioned us well for future earnings stability. As a result, we generated $1.0 million dollars in adjusted net income for the quarter. Production was up 21% and we posted a significant increase in total revenues while our overall expenses decreased by 2%. We continue to be highly focused on driving core earnings, strengthening our balance sheet and delivering value to our shareholders.

32.     On November 3, 2016, Stonegate announced its financial results for the third quarter of 2016. The Company reported net income of $15.6 million, or $0.60 per diluted share, compared to a net loss of $20.2 million, or $0.78 per diluted share, for the third quarter 2015.  Jim Smith, Chief Executive Officer of Stonegate commented in the press release announcing the results, stating:

We are extremely pleased to report strong GAAP and adjusted net income for the third quarter. Our business platform was well prepared to benefit from increased production levels during the quarter and, as a result, we achieved GAAP earnings of $15.6 million and adjusted net income of $11.0 million. We continue to be highly focused on maintaining prudent liquidity and MSR debt levels, as well as fully leveraging our cost structure. Thanks to the dedication and commitment of our associates and the support of our many customers, Stonegate continues to deliver value to our shareholders.

33.     As reflected in these quotes and in the Company's recent financial results and concurrent press releases and statements, Stonegtae is poised for significant growth and expansion, and is expected to continue to, yield returns for the Company and its shareholders well into the future.

34.     However, despite the financial strength of the Company and its position as a premier player in the non-bank mortgage industry, the Individual Defendants have entered into the Merger Agreement with Home Point, depriving the Plaintiff and the public shareholders of the Company the opportunity to participate in the growth of the Company in which they have loyally invested.

## THE FLAWED PROCESS

35.     As revealed by the Proxy, the Merger Agreement is the result of an expedited, skewed process designed to ensure the sale of Stonegate to one buyer, and one buyer only – Home Point – on terms preferential to Home Point, and to subvert the interests of Plaintiff and the other public stockholders of Stonegate.  In particular, the process leading to the Proposed Transaction was tilted toward Home Point, such that the Board rebuffed interested strategic alternatives and acquirers consistently throughout the sales process and permitted the Company's board to press forward with a single-bidder in the Proposed Transaction.

36.     Specifically, the "sales" process substantively only began in December 2015, with the engagement of Barclays and FBR Capital Markets & Co. (which is referred to as "FBR" and collectively with Barclays is referred to as the "Company financial advisors") – approximately thirteen months

before the Proposed Transaction was announced.  However, even in such limited time, Stonegate rebuffed several interested parties, which resulted in this single-bidder process.  Specifically, in the first and second quarter 2016, Stonegate and Barclays and FBR engaged in preliminary exploratory discussions with numerous financial institutions (including Home Point).

37.    When these preliminary discussions stalled, Stonegate turned to negotiate with Home Point on a virtually exclusive basis with no attempt to conduct a pre-signing market check or negotiate for a post-signing go-shop provision in the Merger Agreement.

38.    Despite the Company's recent financial success and strategic moves, the Board conducted a fundamentally flawed sales process.  The Board failed to conduct an adequate market check and conducted a sales process tilted in favor of a proposed transaction with Home Point.

39.    Stonegate's board from time to time has had general discussions with other financial services companies regarding the possibility of a potential strategic transaction.

40.    On November 11, 2015, the Company executed a non-disclosure agreement (referred to as an "NDA") with a private mortgage company (referred to as "Party A") in connection with considering a strategic transaction between the Company and Party A. The Proxy does not disclose whether this NDA contained a standstill provision.

41.    At a regularly scheduled Company board meeting held on November 24, 2015, the Company board (the "Board") and Company management discussed engaging Barclays and FBR Capital Markets & Co. (referred to as "FBR" and referred to collectively with Barclays as the "Company financial advisors") to advise the Company on the possibility of a potential strategic transaction, including, but not limited to, a sale of the Company. The Company executed engagement letters with Barclays and FBR on December 28, 2015 and January 4, 2016, respectively. Sullivan & Cromwell LLP

(referred to as "Sullivan & Cromwell"), the Company's outside legal counsel, also began to advise the Company with respect to engaging in a strategic process during the second half of December 2015.

42.  On February 4, 2016, the Board held a special meeting telephonically, with representatives of Company management, the Company financial advisors and Sullivan & Cromwell in attendance, to discuss the potential strategic process. During the meeting, the Board established a working group (referred to as the "Company Board Working Group") consisting of four directors, Richard Kraemer, Kevin Bhatt, James Brown and Sam Levinson, to work closely with the Company's financial advisors and legal counsel in connection with the strategic process. Messrs. Bhatt, Brown and Levinson are each indirect beneficial owners of a substantial amount of Company common stock and together owned approximately 35.5% of the outstanding Company common stock as of the date of the merger agreement (see "Security Ownership of Certain Beneficial Owners and Management").

43.  On February 26, 2016, the Board held a special meeting and following extensive discussion, the Board determined to engage in a formal process for pursuing such a strategic transaction. During the meeting, the Board selected 14 potential institutions, including Home Point and Party A, for outreach based on a list of potential strategic counterparties circulated by the Company financial advisors to the Board in advance of the meeting. The counterparties were selected based on the Board's and the financial advisors' understanding of each such institution's potential interest and financial capacity to complete a possible business combination with the Company. The Board directed the financial advisors to reach out to the 14 selected institutions in order to determine if they would be interested in engaging in exploratory discussions with respect to a potential transaction.

44.  Beginning on March 10, 2016, at the Board's request, representatives of the Company financial advisors privately contacted each of the 14 parties on behalf of the Company to solicit interest

in a potential strategic transaction with the Company. The Company executed NDAs with 12 parties, including Stone Point, between March 11, 2016 and April 1, 2016. The NDA between the Company and Stone Point, which covers Home Point, was executed on March 16, 2016.

45.     Beginning on March 22, 2016, at the Board's request, the Company financial advisors sent a letter to each of the potential counterparties that had signed an NDA in order to solicit non-binding written proposals for a possible strategic transaction with the Company. Each potential counterparty that had signed an NDA was also provided access to certain non-public information regarding the Company, including the confidential information memorandum, in a Phase I electronic data room, which was opened on March 23, 2016.

46.     On April 7, 2016, representatives of FBR met telephonically with the Chief Executive Officer and other members of management of one of the potential counterparties that the Company financial advisors had initially contacted in March 2016 but that had not previously signed an NDA (which we refer to as "Party B"). FBR and Party B, a private mortgage company, discussed Party B's interest in a potential strategic transaction with the Company. On the same day, the Company and Party B executed an NDA and Party B received the confidential information memorandum and was granted access to the Phase I electronic data room.

47.     On April 11, 2016, the Company financial advisors received a non-binding written proposal from one of the potential counterparties that had signed an NDA in March 2016 and that had received the confidential information memorandum and access to the Phase I electronic data room (referred to as "Party C"). Party C, a private mortgage company, proposed to acquire the Company through a merger transaction for 100% stock consideration, with Company stockholders to own 42% of the combined company on a fully diluted basis following the transaction.

14

48.    On April 12, 2016, the Company financial advisors received non-binding written proposals from four potential counterparties: Home Point and three additional private mortgage companies, each of whom had signed an NDA in March 2016 and received the confidential information memorandum and access to the Phase I electronic data room (referred to as "Party D," "Party E," and "Party F," respectively). Home Point proposed to acquire the Company through a merger transaction at a price in the range of $6.34 to $6.91 per share in cash, a premium of approximately 13.4% to 23.6% over $5.59, the closing price of Company common stock on the NYSE on such date. Party D proposed to acquire the Company through a merger transaction at a price of $7.00 per share in cash, a premium of approximately 25.2% over the closing price of Company common stock on the NYSE on such date. Party E proposed to acquire the Company through a merger transaction at a price of $6.50 per share, a premium of approximately 16.3% over the closing price of Company common stock on the NYSE on such date, with the form of consideration undetermined. Home Point and Party E each indicated that they were also willing to consider a transaction structure involving stock consideration. Party F proposed that the Company acquire Party F for an undetermined amount of cash and stock consideration.

49.    On April 15, 2016, the Board held a meeting and determined to invite Home Point, Party C, Party D and Party E to continue participating in a Phase II process. The Board directed representatives of Company management and the Company financial advisors to continue to engage with those parties and their respective financial advisors, and such discussions continued throughout April and May 2016. The Board declined to engage with Party F regarding its proposal for the Company to acquire Party F.

50.    During the second half of April 2016, at the Board's request, the Company financial advisors contacted Party E and requested that Party E clarify whether its proposed purchase price of $6.50 per share would take the form of cash consideration, stock consideration or a combination of both

cash and stock consideration. The Company financial advisors also asked Party E to conduct due diligence with respect to the Company's valuation. Party E subsequently declined to conduct any valuation diligence or revise its initial non-binding written proposal and discontinued discussions with the Company.

51.    Effective April 18, 2016, the Board appointed James V. Smith as Chief Executive Officer and President of the Company. Richard A. Kraemer, who had served as the interim Chief Executive Officer of the Company since September 10, 2015, continued in his role as Chairman of the Board and as a member of the Board Working Group.

52.    On May 17, 2016, Mr. Smith met with a member of Party B management in New York, New York regarding a potential strategic transaction between the Company and Party B. Following the meeting, Party B proposed a business combination pursuant to which Company stockholders would own 70% of the combined company on a fully diluted basis following the transaction and Party B equity holders would own the remaining 30% of the combined company.

53.    On June 16, 2016, in response to Party B's initial proposal, the Company counter proposed a transaction pursuant to which Company stockholders would own 72% of the combined company on a fully diluted basis following the transaction and Party B equity holders would own the remaining 28% of the combined company.

54.    On July 15, 2016, members of the Board Working Group met with representatives of Party C in New York, New York to discuss potential business operations and synergies in connection with a potential business combination. During the meeting, Party C verbally revised its former proposal to contemplate a transaction pursuant to which Company stockholders would own 60% of the combined

company on a fully diluted basis following the transaction and Party C equity holders would own the remaining 40% of the combined company. The Company and the Company financial advisors continued to evaluate a potential transaction with Party C throughout July 2016.

55.    On July 26, 2016, Party B revised its proposal to contemplate the same pro forma ownership percentages for the combined company as its initial proposal (70% owned by the Company stockholders and 30% owned by Party B's equity holders) plus a $25 million cash payment to be made to Party B's equity holders.)

56.    On August 2, 2016, the Board held a special meeting, where the Board directed representatives of Company management and the Company financial advisors to reengage with Home Point and Party D to encourage Home Point and Party D to each submit an updated non-binding written proposal to acquire the Company for all cash consideration. With respect to Party C, the Board directed the Company financial advisors to counter Party C's most recent proposal with a proposal for a transaction pursuant to which Company stockholders would own 55% of the combined company on a fully diluted basis following the transaction and Party C equity holders would own the remaining 45% of the combined company. With respect to Party B, the Board determined that Party B's proposal was less compelling than the other proposals under consideration and directed the Company financial advisors to advise Party B that its proposal was not sufficient for purposes of continuing discussions with Party B.

57.    The Company and the Company financial advisors continued to evaluate a potential transaction with Party C throughout August 2016. Unable to come to an agreement on the pro forma ownership percentages between the Company and Party C for the combined company, Party C discontinued discussions with the Company at the end of August 2016.

58. On August 31, 2016, Home Point submitted a revised non-binding written proposal to acquire the Company through a merger transaction at a price in the range of $5.75 to $6.25 per share in cash, a premium of approximately 39.2% to 51.3% over $4.13, the closing price of Company common stock on the NYSE on such date. The Company financial advisors also met telephonically with representatives of Home Point to discuss the proposal.

59. On September 17, 2016, Party D submitted a revised non-binding written proposal, dated September 16, 2016, to acquire the Company through a merger transaction at a price in the range of $5.50 to $6.00 per share in cash, a premium of approximately 35.1% to 47.4% over $4.07, the closing price of Company common stock on the NYSE on September 16, 2016.

60. On September 20 and 23, 2016, the Company financial advisors met telephonically with Party D and its financial advisor to further discuss Party D's proposal. During the meetings, the Company financial advisors indicated to Party D that its proposed price per share in the range of $5.50 to $6.00 submitted on September 17, 2016 needed to be improved in order for the Company to be willing to continue to engage with Party D. The Company financial advisors asked Party D to improve its proposal based on the anticipated corporate level synergies for the combined company, among other factors. Party D requested additional diligence information from the Company, including updated financial information.

61. On September 27, 2016, the Company financial advisors met telephonically with representatives of Home Point to further discuss Home Point's proposal. During the meeting, Home Point indicated verbally to the Company's financial advisors that Home Point might be willing to increase its proposed price to $7.25 per share, but only if the Company agreed to a 30-day exclusivity

period to negotiate a definitive merger agreement with Home Point (during which period the Company would be prohibited from discussing alternative potential transactions with, or soliciting acquisition proposals from, third parties).

62.    On September 28, 2016, the Board Working Group held a telephonic meeting, with representatives of Company management, the Company financial advisors and Sullivan & Cromwell in attendance, to discuss Home Point's new proposed price and request for exclusivity. The Board Working Group directed representatives of Company management, the Company financial advisors and Sullivan & Cromwell to continue exploring a transaction with Home Point at the increased price of $7.25 per share, including potentially agreeing to an exclusivity arrangement, provided that Home Point submit a proposed due diligence plan and review and provide a markup of a draft merger agreement for the transaction.

63.    On October 5, 2016, Home Point submitted a revised non-binding written proposal to acquire the Company through a merger transaction at a price of $7.25 per share in cash, a premium of approximately 52.1% over $4.60, the closing price of Company common stock on the NYSE on such date. The proposal noted that Home Point would be willing to provide a high-level response to the Company's draft merger agreement, provided that the Company agreed to provide Home Point with 30-day exclusivity within three days of receipt of Home Point's response to the draft merger agreement.

64.    On October 6, 2016, Barclays sent an initial draft of the merger agreement prepared by Sullivan & Cromwell, which was previously reviewed by the Board Working Group, to Home Point on behalf of the Company.

65.    On October 8, 2016, Party D submitted a revised non-binding written proposal to acquire the Company through a merger transaction at a price in the range of $6.00 to $6.50 per share in cash, a

premium of approximately 33.9% to 45.1% over $4.48, the closing price of Company common stock on the NYSE on October 7, 2016.

66.    In late October 2016, a publicly traded mortgage company (referred to as "Party G") proactively reached out to a member of the Board to express its interest in acquiring the Company. The Company executed an NDA with Party G on October 24, 2016 and provided Party G with access to the electronic data room on October 27, 2016. The Proxy does not disclose whether the NDA contained a standstill provision.

67.    On November 3, 2016, Kirkland & Ellis sent Sullivan & Cromwell a first markup of the merger agreement. Home Point sent Barclays a draft exclusivity agreement and diligence plan and requested to schedule due diligence meetings with Company management.

68.    On November 8, 2016, Party G submitted a non-binding written proposal to acquire the Company through a merger transaction for a mix of cash and stock consideration, with Company stockholders to own 30% of the combined company on a fully diluted basis following the transaction. Party G's proposal valued the Company common stock at $5.00 per share, a premium of approximately 28.5% over $3.89, the closing price of Company common stock on the NYSE on such date.

69.    On November 9, 2016, the Board held a special meeting to discuss the most recent proposals received from Home Point and Party D as well as the new proposal from Party G. Following extensive discussion, the Board concluded that the proposal from Home Point was the superior proposal at such time and directed representatives of Company management and the Company's advisors to continue exploring a transaction with Home Point, including entering into the exclusivity agreement with Home Point. The Board directed Sullivan & Cromwell to send revised markups of the merger agreement and exclusivity agreement to Kirkland & Ellis. It should be noted that the Proxy does not

disclose the basis for the Board's determination that the proposal from Home Point was the superior proposal.

70.   On November 10, 2016, Party G submitted a revised non-binding written proposal at an increased price of $6.50 per share of Company common stock, a premium of approximately 56.6% over $4.15, the closing price of Company common stock on the NYSE on such date. Party G proposed that half of the consideration would be paid in cash and the other half in Party G common stock.

71.   On November 14, 2016, the Board held a special meeting telephonically, with representatives of the Company financial advisors and Sullivan & Cromwell in attendance, to receive an update on the process and discuss the revised proposal received from Party G. Representatives of Sullivan & Cromwell also updated the Board on the status of the draft Home Point exclusivity agreement, noting that all open issues had been resolved since the November 8, 2016 Board meeting. Following extensive discussion, the Board concluded that the proposal from Home Point remained the superior proposal at such time and directed representatives of Company management and the Company's advisors to continue exploring a transaction with Home Point. The Board approved entering into the exclusivity agreement with Home Point and directed Sullivan & Cromwell to prepare the exclusivity agreement for execution.

72.   On November 14, 2016, following the Board meeting, the Company and Home Point Capital, Inc. entered into an exclusivity agreement with an expiration date of December 16, 2016. The exclusivity agreement required Home Point to make two interim written affirmations of its proposed price per share of $7.25 during the exclusivity period, on November 25, 2016 and December 5, 2016, respectively, and provided that the exclusivity agreement would automatically terminate if Home Point

did not make either such affirmation. Pursuant to the exclusivity agreement, discussions with other parties were put on hold and access to the electronic data room was terminated for such other parties.

73. On November 15, 2016, Home Point informed the Company financial advisors that it had engaged Houlihan Lokey Capital, Inc. (referred to as "Houlihan Lokey") as its financial advisor to assist with the strategic transaction process.

74. On November 25, 2016, Mr. Newman confirmed in writing to the Company financial advisors, in accordance with the terms of the exclusivity agreement, that Home Point, its affiliates and their representatives had not, as of such date, discovered any information regarding the Company or the proposed transaction in the course of their due diligence or other analysis regarding the proposed transaction that had caused Home Point to believe that it was no longer willing to pay the proposed purchase price of $7.25 per share.

75. On December 5, 2016, Mr. Newman, Home Point's Chief Executive Officer, again confirmed in writing to the Company financial advisors, in accordance with the terms of the exclusivity agreement, that Home Point, its affiliates and their representatives had not, as of such date, discovered any information regarding the Company or the proposed transaction in the course of their due diligence or other analysis regarding the proposed transaction that had caused Home Point to believe that it was no longer willing to pay the proposed purchase price of $7.25 per share.

76. On December 8, 2016, the Board Working Group held a telephonic meeting, with representatives of the Company financial advisors and Sullivan & Cromwell in attendance, to receive an update on the process and the status of negotiations with Home Point. The directors and financial advisors discussed the increase in the Company's book value, mainly due to an increase in the value of

the Company's mortgage servicing rights as a result of increased interest rates, since the purchase price of $7.25 per share was initially proposed by Home Point. The Board Working Group and the Company financial advisors discussed that, in light of such increase in the value of the Company's mortgage servicing rights, the proposed $7.25 per share purchase price was no longer adequate to merit pursuing a transaction with Home Point at that price at such time. The Board Working Group members agreed that Home Point must increase its proposed purchase price per share in order for the Company to continue to have any further interest in a transaction with Home Point.

77.    On December 15, 2016, representatives of the Company financial advisors met with representatives of Houlihan Lokey in New York, New York to discuss the Company's and Home Point's respective valuations of the Company. During the meeting, the Company financial advisors informed the representatives of Houlihan Lokey that Home Point's proposed purchase price of $7.25 per share was no longer adequate in light of the increase in the Company's book value since Home Point's offer was initially proposed.

78.    Also on December 15, 2016, the Company board held a special meeting, to receive an update on the process and the status of negotiations with Home Point. The Board further discussed the Company board working group's prior discussions that Home Point's proposed purchase price of $7.25 per share was no longer adequate in light of the increase in the Company's book value since Home Point's offer was initially proposed, as well as the communications to that effect to Home Point. The Board determined to not extend the exclusivity period with Home Point, which was due to expire the following day, due to the absence of an agreement regarding the purchase price. At 5:00 p.m. Eastern Standard Time on December 16, 2016, the term of the exclusivity agreement between Stonegate and Home Point expired.

79.     On December 19, 2016, the Board held a special meeting telephonically to further discuss and come to a consensus on a revised purchase price to propose to Home Point for purposes of continuing to pursue a transaction with Home Point. During the meeting, the Board determined to counter Home Point's proposed purchase price of $7.25 per share with a purchase price of $8.35 per share. The Proxy fails to disclose whether the Board considered contacting any of the other potential bidders, given that the exclusivity agreement between Stonegate and Home Point had expired.

80.     On December 20, 2016, representatives of Barclays contacted representatives of Houlihan Lokey to communicate the Company board's purchase price guidance of $8.35 per share.

81.     On January 4, 2017, the members of the Board Working Group and representatives of Home Point met in New York, New York (with Mr. Kraemer joining the meeting telephonically) to discuss whether or not there was a purchase price at which the Company and Home Point were both willing to continue pursuing a transaction. Following negotiations and a discussion of certain other outstanding legal and commercial issues, Home Point informed the Company that it was willing to increase its proposed price to $8.00 per share, which represented a premium of approximately 30.5% over $6.13, the closing price of Company common stock on the NYSE on such date.

82.     On the evening of January 4, 2017, the Board held a special meeting telephonically, with representatives of Sullivan & Cromwell in attendance, to discuss the meeting that took place earlier that day and Home Point's revised proposal of $8.00 per share. Following extensive discussion, the Board directed Company management and the Company's advisors to continue to reopen the discussions for a transaction with Home Point based on its revised proposal of $8.00 per share. Members of the Board Working Group communicated the Company board's view to representatives of Home Point and

requested that Home Point instruct Kirkland & Ellis to send a revised markup of the merger agreement to Sullivan & Cromwell.

83.     On January 6, 2017, Kirkland & Ellis sent a revised markup of the merger agreement to Sullivan & Cromwell.

84.     On January 10, 2017, Kirkland & Ellis sent Sullivan & Cromwell a draft form of voting agreement. Sullivan & Cromwell circulated the draft voting agreement to certain Company directors, officers and Company stockholders expected to enter into a voting agreement with Home Point.

85.     On January 13, 2017, Sullivan & Cromwell and Kirkland & Ellis commenced discussions regarding Home Point's desire to protect the Company's net operating losses ("NOLs") between signing and closing through implementation of a tax asset protection plan.

86.     On January 15, 2017, Kirkland & Ellis sent Sullivan & Cromwell a draft of the equity commitment letter to be provided by certain investment funds managed by Stone Point in favor of Home Point. The draft equity commitment letter named the Company as an express third party beneficiary.

87.     From January 18 to 24, 2017, the Company and Home Point, with assistance from their respective legal counsel and financial advisors, continued to negotiate the commercial and legal terms of the proposed transaction and related documentation. On January 19, 2017, Sullivan & Cromwell sent Kirkland & Ellis a draft of the TAP plan.

88.     On January 25, 2017, the Board held another special meeting. Company management and the Company's advisors updated the Board on events since January 24, 2017, including the negotiation of all definitive documentation. Barclays then reviewed and discussed its final financial analyses with respect to the Company and the proposed transaction with the Board. Thereafter, at the request of the

Board, Barclays rendered its oral opinion to the Board (which was subsequently confirmed in writing by delivery of Barclays' written opinion to the Board dated January 26, 2017) as to, as of the date of such opinion, the fairness, from a financial point of view, to the Company stockholders of the merger consideration to be received by such stockholders in the merger pursuant to the merger agreement.

89.    Following the delivery of Barclays' opinion, the Board resolved to recommend that the Company stockholders adopt the merger agreement and approve the merger.

90.    On the evening of January 25, 2017, the Company, Home Point and their respective legal counsel and financial advisors met telephonically to discuss the remaining open items in the transaction documents. During the meeting, the Company informed Home Point that the Board had unanimously approved the proposed transaction with Home Point and had directed Company management to finalize the definitive merger agreement on the terms approved by the Board.

91.    On January 26, 2017, Sullivan & Cromwell and Kirkland & Ellis finalized the terms of the merger agreement and, during the evening of January 26, 2017, the Company and Home Point executed the merger agreement. Also during the evening on January 26, 2017, certain directors, officers and Company stockholders executed the voting agreements with Home Point, pursuant to which such persons agreed to vote in favor of, and otherwise support, the merger agreement and the merger.

92.    At 8:30 a.m. Eastern Standard Time on January 27, 2017, Home Point and the Company issued a joint press release announcing the execution of the merger agreement.

## THE PROPOSED TRANSACTION

93.    Despite the Company's position for significant future growth, on January 27, 2017, the Company issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

### Home Point Financial to Acquire Stonegate Mortgage Corporation

**ANN ARBOR, MI and INDIANAPOLIS, IN--**(Marketwired - January 27, 2017) **-** Home Point Financial Corporation ("Home Point") and Stonegate Mortgage Corporation (NYSE: SGM) ("Stonegate Mortgage") today announced that they have entered into a definitive agreement for Home Point to acquire Stonegate Mortgage in an all-cash transaction valued at approximately $211 million. On a pro forma basis, the acquisition would position Home Point as a top-25 mortgage originator and servicer.

Under the terms of the agreement, Stonegate Mortgage's stockholders will receive $8.00 per share. The per share price represents a premium of approximately 61 percent over Stonegate Mortgage's 90-day volume weighted average price on January 26, 2017, and a 34 percent premium over Stonegate Mortgage's closing price per share on January 26, 2017.

"We are very excited about the opportunity to work together with the Stonegate Mortgage team to accelerate the build out of Home Point Financial," said Willie Newman, Home Point's Chief Executive Officer. "The combined business will have full national coverage across all channels of mortgage origination, as well as vertical integration across the mortgage value chain. Most important, the talent and experience of the combined team will give us the ability to fulfill Home Point's vision of being a leader in mortgage banking and financial services."

Jim Smith, Chief Executive Officer of Stonegate Mortgage, commented, "The combination of Stonegate Mortgage and Home Point Financial creates an exciting opportunity for our company, our associates and our customers. We look forward to joining forces with the Home Point Financial team and building a best in class mortgage origination and servicing platform focused on delivering value to our customers."

***

Tax Asset Protection Plan

In connection with the transaction, Stonegate Mortgage additionally announced today that its Board of Directors has adopted a Tax Asset Protection Plan (the "Plan"), which is designed to protect Stonegate Mortgage's tax assets during the period prior to the closing of the proposed merger between Stonegate Mortgage and Home Point (the "Proposed Merger"). This Plan is similar to tax benefit protection plans adopted by other public companies with significant tax attributes. As of September 30, 2016, Stonegate Mortgage had U.S. federal net operating loss carryforwards of approximately $163.5 million.

Home Point's ability to use the tax attributes of Stonegate Mortgage may be significantly limited if there were an "ownership change" (as defined under Section 382 of the Internal Revenue Code) prior to the closing of the Proposed Merger. In general, an ownership change occurs if there is a cumulative change in the ownership of Stonegate Mortgage by "5 percent stockholders" that exceeds 50 percentage points over a rolling three-year period.

As part of the Plan, the Stonegate Mortgage Board of Directors today declared a dividend of one preferred share purchase right for each outstanding share of Stonegate Mortgage's common stock. The rights will be distributable to stockholders of record as of February 6, 2017, as well as to holders of Stonegate Mortgage's common stock issued after that date.

The Plan is designed to reduce the likelihood that Stonegate Mortgage will experience an ownership change prior to the closing of the Proposed Merger by discouraging any person from acquiring beneficial ownership of 4.9 percent or more of Stonegate Mortgage's outstanding common stock.

Existing stockholders holding 4.9 percent or more of Stonegate Mortgage's outstanding shares of common stock are exempt from the provisions of the Plan unless they make additional purchases. Stonegate Mortgage's Board of Directors also has the discretion under certain circumstances to exempt acquisitions of Stonegate Mortgage's securities from the provisions of the Plan and can redeem the rights issued pursuant to the Plan. The issuance of the rights will not affect Stonegate Mortgage's reported earnings per share and is not taxable to Stonegate Mortgage or its stockholders.

Additional information regarding the Plan will be contained in a Form 8-K and in a Registration Statement on Form 8-A that Stonegate Mortgage is filing with the Securities and Exchange Commission.

*** 

94.    On January 27, 2017, the Company filed a Form 8-K with the SEC wherein it disclosed the Merger Agreement.  Collectively, the press release announcing the transaction and the filing of the Merger Agreement reveal that the Proposed Transaction is the product of a flawed sales process and, unless the Merger Consideration is increased, would be consummated at an unfair price.

95.    The Company's standalone prospects far outweigh the value offered in the Proposed Transaction. The Merger Consideration represents a premium to Stonegate's 52-week standalone high of $6.15 per share, which it reached on January 05, 2017. However, the stock closed above the implied value of the Merger Consideration as recently as September 17, 2015, when it closed at $8.26 per share.

96.    What is more, the Merger Consideration is contrary to recent guidance from regular Company analysts. As recently as January 2016, Credit Suisse set standalone price target of $8.00. This standalone price target is consistent with Stonegate's position for long-term growth and profitability. Indeed, on November 03, 2016, Stonegate announced its **earnings of $0.41 per share**. According to the

Company, "[d]uring both the second and third quarters, we have successfully generated core profitability during each month….We believe that these efforts will continue to improve our overall execution, strengthen our balance sheet and increase shareholder value."

97.    Despite these successes, the Individual Defendants agreed to sell the Company for a value of just $8.00 per share.

98.    In short, the value of Stonegate on a standalone basis is higher than the value offered by the Merger Consideration.

**THE MERGER AGREEMENT UNFAIRLY DETERS COMPETITIVE
OFFERS AND IS UNDULY BENEFICIAL TO HOME POINT**

99.    The Proposed Transaction is also unfair because, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction *a fait accompli* and ensure that no competing offers will emerge for the Company.

100.    The Merger Agreement contains a No-Solicitation clause in which the Company must immediately cease and terminate any existing solicitation.   In fact, Section 6.9(a) of the Merger Agreement forces the Company to cease any communications already occurring, stating:

> The Company will, and will cause its Representatives to, immediately cease and cause to be terminated any activities, discussions or negotiations conducted before the date of this Agreement with any person other than Parent and its affiliates and Representatives with respect to any Acquisition Proposal, including by terminating all physical and electronic data room access previously.

101.    Section 6.9(a) further expressly prohibits the Company from soliciting any Acquisition Proposals, stating:

> The Company agrees that it will not, and will cause its Subsidiaries and its and their officers, directors, employees and controlled affiliates and its and their agents, advisors, consultants, and other representatives (collectively, "<u>Representatives</u>") not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or knowingly

29

facilitate inquiries, offers or proposals, or the making, submission or announcement of inquiries, offers or proposals, which constitute, or could reasonably be expected to lead to, an Acquisition Proposal, (ii) engage or participate or continue any discussions or any negotiations with any person concerning any Acquisition Proposal, (iii) provide any confidential or nonpublic information or data to, or have or participate in any discussions with, any person relating to any Acquisition Proposal or any inquiry, offer or proposal that could reasonably be expected to lead to an Acquisition Proposal….

102. Furthermore, Section 6.9(a) grants Home Point recurring and unlimited information rights, which gives Stonegate forty-eight (48) hours to provide unfettered access to confidential, non-public information about competing proposals from third parties, plus an additional forty-eight (48) hours following a material amendment to the terms.

103.  In addition, § 6.9(c) of the Merger Agreement demands that should the Board determine to enter into a superior competing proposal, it must grant Home Point three (3) business days, plus an additional three (3) business days following a material amendment to the terms and conditions of a superior offer, in which the Company must negotiate in good faith with Home Point and allow Home Point to make a counter-offer so that the superior offer is no longer superior.  In other words, the Merger Agreement gives Home Point access to any rival bidder's information and allows Home Point a free right to top any superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Home Point, which can piggy-back on the due diligence of the foreclosed second bidder.

104. Further, § 6.9(b) includes a "change of recommendation" provision which restricts the Company and board of directors from changing, qualifying, withholding, withdrawing or modifying, or publicly proposing to do any of the aforementioned, the Recommendation.

105. Compounding matters, Section 8.2(b)(i) of the Merger Agreement requires the Company to pay a termination fee to Home Point in the event the Company decides to pursue any alternative offer. By the terms of the Merger Agreement, this termination fee will be payable to Home Point in the amount

of $7,250,000.  As such, this termination fee would require any competing bidder to agree to pay a naked premium simply for the right to provide Stonegate's shareholders a superior offer.

106.  Additionally, in connection with Proposed Transaction, Stonegate has entered into a Tax Asset Protection Plan. According to the terms of the Plan, the Stonegate Board is granting existing shareholders "rights" to purchase 1/10000 of a share of preferred stock for each common share they own, with the rights kicking in upon the announcement of a potential buyer's tender or exchange offer for the company's shares. In effect, this plan functions to dilute the ownership stake of an acquirer, making it more expensive to buy the company and at the same time dissuading potential third party purchasers.

107.  Moreover, in connection with the Proposed Transaction, Home Point has entered into a voting agreement with certain stockholders, directors and executive officers of the Company in their capacity as stockholders of the Company.  According to the Proxy, the shareholders that executed the voting and support agreement collectively own approximately 35.9% of Stonegate's outstanding shares, which under the terms of the voting agreements will be voted in favor of the Proposed Transaction.

108.  Finally, the Merger Agreement further contains a "no-waiver" provision, which requires the Board to enforce any existing confidentiality or standstill agreements and may be preventing any potentially competing bids from coming forward.

109.  Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The narrow circumstances under which the Board may respond to a proposal for an alternative transaction that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

## THE FALSE AND MISLEADING PROXY STATEMENT

110.  Finally, it is critical that stockholders receive complete and accurate information about the Proposed Transaction prior to deciding whether to vote in favor of the Proposed Transaction. The Individual Defendants have a duty under Sections 14(a) and 20(a) of the Exchange Act to disclose all material information regarding the Proposed Transaction to Stonegate stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction or seek to exercise their appraisal rights.

111.  To date, however, the Individual Defendants have failed to provide Stonegate stockholders with such information, in violation of Sections 14(a) and 20(a) of the Exchange Act. As set forth in more detail below, the Proxy omits and/or misrepresents material information concerning, among other things: (1) Stonegate's financial projections; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinion" provided by Barclays; (3) the data and inputs underlying the financial valuation exercises of Barclays and FBR, Stonegate's financial advisors; and (4) the background of the Proposed Transaction.

### (a)    Management's Projections

112.  The Proxy discloses that Barclays and FBR expressly relied on Stonegate management's projections (the "Management Projections") in assessing the fairness of the Proposed Transaction to Stonegate stockholders and rendering their respective fairness opinions. However, the Management Projections are missing the following information: (1) net operating losses ("NOLs"); (2) stock-based compensation; (3) reconciliation of net income to adjusted net income; (4) dividends; (5) project book value of equity; (6) adjusted net operating earnings; and (7) sum-of-the-parts detail for business segments.

32

113. Because Barclays relied on these projections in performing their financial analyses and rendering their fairness opinions, the omission of this information renders the entire fairness opinion of each financial advisor, in the Proxy false and/or materially misleading.

114. These statements in the Proxy are rendered false and/or misleading by the omissions identified above as this information is integral to stockholders' evaluation of the consideration being offered in the Proposed Transaction.  These financial projections provide a sneak peek into Stonegate's expected future performance (i.e., growth/profitability) and, consequently, its value as a standalone entity.  More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders, as it comes from members of corporate management who have their fingers on the pulse of the Company.  Accordingly, it is no surprise that financial projections are among the most highly sought-after disclosures by stockholders in the context of corporate transactions such as this.

(b)      <b>Barclays' Financial Analyses</b>

115.  The Proxy also fails to fully and fairly disclose certain material information concerning the financial analyses conducted by Barclays that purport to support its fairness opinion.

116.  For example, with respect to Barclay's *Dividend Discount Analysis*, the Proxy fails to explain what "average weighted cost of equity" means, to identify the variables used to calculate it, to quantify the variables, and to provide the basis for each. With respect to the "Analyst Perspectives on the Company," which was one of the other factors, aside from its financial analyses, used by Barclays' in reaching its fairness determination, the Proxy fails to quantify the price targets reviewed by Barclays.

117.  With respect to the *Precedent Transactions Analysis* and the *Premiums Paid Analysis*, the Proxy fails to disclose any of the information use in performing these analyses.

118. These statements in the Proxy are rendered false and/or misleading by the omissions identified above because such omissions are essential to the stockholders' ability to properly evaluate the analysis performed by Barclays. Without the aforementioned information, stockholders ability to understand Stonegate's analysis is significantly limited, rendering them unable to make a fully-informed decision whether to vote to approve the Proposed Transaction.

### (c)    Sales Process Leading to the Proposed Transaction

119. Finally, the Proxy fails to fully and fairly disclose certain material information concerning the process leading to the Proposed Transaction. With respect to the sales process that led to the Proposed Transaction, the *Background of the Merger* section contained on pages 27-38 of the Proxy is materially deficient in that it fails to disclose:

      (a)    whether the NDAs entered into between the Company and its potential bidders contained standstill provisions;

      (b)    the basis for the Board's determination on November 9, 2016 that the proposal from Home Point was the superior proposal; and

      (c)    whether the Board reconsidered any other potential bidders after the exclusivity agreement between the Company and Home Point expired on December 16, 2016.


120. The Proxy is false and/or misleading due to the omissions identified in above because it does not give stockholders material information that will allow them to fairly assess the process undertaken by the Board leading up to the Proposed Transaction.

121. Defendants' failure to provide Stonegate stockholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this

information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

122.   Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### (Against the Individual Defendants and Stonegate)

136.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.   SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

138.   During the relevant period, the Individual Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. Stonegate is liable as the issuer of these statements.

139.    By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants. The Proxy misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. The defendants were at least negligent in filing the Proxy with these materially false and misleading statements. The defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

140.    The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

141.    By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

142.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

143.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants and Home Point)**

144.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.     The Individual Defendants acted as controlling persons of Stonegate within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Stonegate and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

146.     Each of the Individual Defendants and Home Point were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

147.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, each of the Individual Defendants is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at

issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

148.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions that had input from the Individual Defendants.

149.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A)     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representatives and its counsel as Class counsel;

(B)     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain an agreement providing fair and reasonable terms and consideration to Plaintiff and the Class;

(C)     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

(D)     Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

(E)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

(F)     Granting such other and further equitable relief as this Court may deem just and proper.

Dated: March 8, 2017                         Respectfully submitted,

                                             KARON LLC


                                             _s/Daniel R. Karon_____
                                             Daniel Karon
                                             700 W. St. Clair Ave.
                                             Suite 200
                                             Cleveland, OH  44113
                                             (216) 622-1851


*Counsel for Plaintiff:*

**LEVI & KORSINSKY, LLP**
Shane T. Rowley
733 Summer Street, Suite 304
Stamford, CT 06901
(203) 992-4523
(212) 363-7171

**WOLF HALDENSTEIN, LLP**
Gregory M. Nespole
270 Madison Avenue
New York, NY 10016
(212) 545-4600